Good afternoon, Your Honors. My name is Stephen Meyrie. I'm the acting United States attorney for the District of Nevada, and I'm here on behalf of the United States. May it please the Court if I would like to reserve approximately five minutes of my time. Just watch the clock. You may certainly do so. Your Honor, this case is before you on an appeal by the United States from a dismissal by the district court of an indictment charging these defendants with very serious crimes of Federal law. As this Court has consistently held, the dismissal of an indictment based on prosecutor conduct is a very drastic, very drastic step, a very rare remedy that's invoked only in the rarest of circumstances. Those circumstances, as this Court has held, is where there is a clear violation of either a statute or of a constitutional right, that that violation is clear in law and in fact, that the conduct itself is so outrageous or so grossly shocking to violate the universal sense of justice, that there is substantial prejudice to the defendant, and that the remedy is proportionate to the offense. In this case, the district court dismissed this case without any basis in law or fact, let alone a clear one. In that regard, the district judge acted arbitrarily and hence, by operation of law, abused his discretion. Your position is that the district court acted without any basis? Any basis in law or fact to dismiss the case. My understanding was the government has conceded that the prosecutor in this case failed to produce 650 pages of rating material. Am I wrong about that? Yes, Your Honor. The government has not conceded that it was 650 pages of rating material. With the government, the government turned over 650 pages of disclosures at trial. We have never stated that it was rating material in the sense of it was completely exculpatory, nor was it giglio material in the sense that it violated, that it was rose to the level of a giglio violation. There were some documents in there, and the government conceded this, that should have been turned over as potentially impeachment material. But to be a violation of giglio, it has to be not only potentially impeachment material, but it must be willfully or recklessly suppressed by the government. The government turned them over at trial. Yes, Your Honor. As I understand – oh, I'm sorry. I was just going to follow up and ask, isn't it correct that there were rap sheets of witnesses who had already completed their testimony and were gone out of the courtroom? There was one rap sheet that I can recall from the records, Your Honor, that involved a witness who was gone from the courtroom. But that rap sheet also showed a conviction that was very stale. I believe it was a 1967 armed robbery conviction, that probably more likely than not could have been used as impeachment material in the first instance because of its staleness. But irrespective of that issue, the fact of the matter is, is that for it to rise to a Brady-Giglio violation, it has to be disclosed so late in the proceedings that it is of no use to the defendant. In this case, the Court could have recalled that witness if, in fact, it was impeachment material in the first instance and have addressed that issue at that time. Okay. This is what we – you know we've been sending out orders asking for this material. Yes, Your Honor. And at one point it showed up and it was redacted. Yes, Your Honor. Black lines through all of this material. Right. And we finally got a copy of the actual documents. I finally got a copy today. It was sitting here at my desk in San Francisco. So my understanding is that, that at least up until now, no one's even made a determination as to whether this material is actually Brady or not Brady or Giglio or not Giglio. I mean, did the district court make such a finding? The district court made no findings of fact or conclusions of law with respect to the 650 pages. That's why we urge that this Court acted arbitrarily. She didn't give – the U.S. attorney didn't give them to the district court until after he had dismissed the indictment. The district court did not base its decision to dismiss the indictment on the 650 pages. It based its decision to dismiss the indictment based on the submissions provided to the court by the defendants on February 7th when the government indicated – or excuse me, the defendants indicated it received the 650 pages from the government. And that, Your Honor, we've included in our excerpts of record as Hearing Exhibit 101, which contains unremarkable documents, you know, a conviction or, excuse me, an arrest record of Brigitte Richards, which is non-impeachment material, a 302 of Michael Levin, who had not testified in any event, was not Jenks material. Did you make these arguments to the district court? I'm sorry, Your Honor. Did you make these arguments to the district court? Your Honor, the arguments in the district court centered on the 650 pages. That's what's so unusual about the circumstances of the dismissal. Does that mean your answer to Judge Wardlaw's question is no? Yes, Your Honor. No. Well, I can't answer that question the way it was framed, Your Honor, because the district court talked in terms of the 650 pages, but the presentation by the defendants was Hearing Exhibit 1. So the prosecutor, in attempting to discuss what was going on, was giving the reasons why the 650 pages was turned over. That's what went on. If you look at the record here, we know that the 650, excuse me, the 650 pages, the issue there was not whether it contained material that was exculpatory or of impeachment value. It was the timing issue. That's all it was about. Whether or not the prosecutor turned it over in a timely fashion. Well, if you're going to get to the issue of timing, then we better determine what's in the 650 pages. But, no, the district judge left to the conclusion that because the prosecutor, who readily admitted didn't have a logbook or didn't keep track of what he had turned over, couldn't positively identify to the court that he turned over those documents, the judge said, well, then I have to accept as true the defendant's representations that they didn't get it. I don't know about the other judges on this panel, but I am not impressed by your raising your voice and pounding the table. I'm sorry. I apologize, Your Honor. But I'm, the fact of the matter is, is that in this context, I've had a prosecutor with a number of years who's been trying cases before the district, that district court, who basically was accused and found by the Federal judge to have engaged in willful and flagrant misconduct. That's what brings my ire. And then the judge says, well, it wasn't intentional, but it wasn't unintentional. So I'm not sure what that means. Yes, Your Honor, and that's the point that we raised in our argument on February 27th, was that the district court on February 7th found that it was not intentional misconduct. He said, I won't go there. And then on February 27th, he found that it was, he didn't rule that it was unintentional. Well, what do we do with this finding on page 323 of the record? I do believe that the assistant U.S. attorney acted flagrantly, willfully, and in bad faith. Isn't that a finding made by the trial judge? Your Honor, it is, it is a finding. It's a conclusion. That's what the government would, that's our position. It's a conclusion, but it's not a finding because it doesn't say with respect to what. It's not clear from the record what was willful misconduct, what was flagrant misconduct. The district court talks about, you know, the fact that these pages were turned over, that it was too late, that they could not engage in discovery, excuse me, they could not engage in investigations that would lead to an empty hole, et cetera. There are a whole host of characterizations, but there was no finding, the court doesn't say on this date the government failed to turn over this document that was a Brady or Giglio violation and therefore worked to substantial prejudice of the defendant, et cetera. I presume you've read the transcript of the trial. Many times, Your Honor, yes. Here's my information. On February 3rd during the trial, AUSA Dam had a witness on the stand named Eslick, and he asked him about a prior conviction. And the defense stands up and says, we've been given no information about this witness having a prior conviction. The judge simply reminded Mr. Dam about his obligation to disclose the material. And then about two weeks later, when Michael Haynes, another government witness, is on the stand again, Mr. Dam asks about a prior conviction, and this time the defense objects again, and they ask for a sidebar. And they say, we haven't been given this information, and Dam represents to a United States district judge that the defense is just flat-out dead wrong that he has produced this information. And the judge says, fine. Let's have a recess and you can show me proof of when you provided it to them. He immediately changes course. Well, Your Honor, if I could advise the Court in an abundance of caution, rather than find the record of what we turned over, we'll make another copy of everything right now and provide it to the defense immediately. The Court, well, it's supposed to be already turned over. It's not a matter of doing it now. And then there is a recess and he comes back and says, in effect, there's no record. This judge does not appear to have leapt to a conclusion. Twice during the government's direct case, government witnesses are asked about prior convictions. The defense objects, saying they haven't been told about them. And the AUSA cannot produce proof that he's produced this stuff. Your Honor, it's true that the prosecutor represented he could not produce proof that he had turned over the documents. He did represent that it was his belief that he had turned them over. He just couldn't prove it. That in itself is not a misrepresentation to the Court. It's simply stating what his belief is. With respect to the sequence, Your Honor, if I could, with respect to Lewis Eslick, I believe the prosecutor in that case had already impeached the witness on direct examination with the previous Federal conviction. The issue with Eslick, as I recall, was the 1957 conviction for impersonating a naval officer, which the district court, on its own motion, later struck. So there was no issue, really, about Lewis Eslick, as I recall. But irrespective of whether or not it's we could basically all day long, and I've struggled with this as well in terms of trying to determine tit-for-tat which witness said this, which witness said that. The bottom line is that when you have at-trial disclosures that the prosecutor represents as being his or her own fault, and that they apologize to the Court and they turn the documents over, the remedy is to grant a continuance, let everybody, you know, regroup, and then resume the trial. Unless, according to our authority, the district court determines that it was willful and intentional and in bad faith. Well, it has to be not only willful, intentional, and bad faith, but it has to be a clear violation of the United States Constitution or statute. There was no statutory violation or constitutional violation. Did the government at the – there was the declaration of a mistrial, and then there was a hearing, later hearing, on the motion to dismiss, correct? I'm sorry, Your Honor. There was a dismissal, and then there was a hearing on the remedy, correct? Well, there was a mistrial. A mistrial. There was a mistrial. That's what I thought I just said. But this all happened fairly closely to each other, did it not? The mistrial was on the one afternoon, and then the motion was heard the next morning. Is that correct? No, Your Honor. On February 7th, the court – the motion was made verbally by the defendants to dismiss the case. Right. Based on the 650 pages. There was brief argument on both sides, and the court said, well, I'm proud – I'm inclined to dismiss the case, but I'll let the government brief the issue of remedy. But in the meantime, I'm going to let the jury go home, declare a mistrial. That leads to my next question. Did the brief parse the 600 pages and describe what, in its opinion, was Brady or not Brady or Giglio or not Giglio? No, Your Honor, because at that point in time – So the answer to my question is no. But who's burdened with that? Yes, Your Honor. I mean, they were arguing – I mean, the defendants are arguing kind of out of both sides of their mouths, and having been a district court judge, I've seen it before, where they say, oh, no, you know, we – we don't want – we don't want a mistrial, but we want the indictment dismissed. But we don't want a mistrial. But whose burden is it to show that there is a clear violation of a constitutional or a federal – a constitutional right or a federal statute when – when you're seeking a motion to dismiss? Your Honor, when the defendants make the motion, or whoever the moving party is, they traditionally have the burden to demonstrate that. And did they do that? Did they come forward and show that there had been a violation of their constitutional or federal right? They came forward with – on February 7th, they came forward with a few documents. There was hearing exhibit one that, as the Court can see in its – in the excerpts of record, there is nothing remarkable about those documents. They're not completely exculpatory. So how did it get blown up into 650 pages of documents? There's no one's reviewed yet. Well, the government has – has reviewed them. The defendants have reviewed them. And I just want to go back and touch on your one point about the redaction. Those documents were redacted because of our LOCA rule that requires. Now, that is simply not true, because that – that statement – I read that statement in your response, and that is not what the LOCA rule requires. And plus, it allows for filing under seal. There was no need to redact those documents. And I saw them in the redacted version. And there were so many redactions, it wasn't even limited just to identification. So you're – you're citing to that rule and saying that was a requirement is just flat-out not right. Well, then, Judge, then we misinterpreted that rule. You're misinterpreting your own rule, your own local Nevada rule? I just disagree with the interpretation that says we don't have to redact it. We have a LOCA rule that says when we file documents electronically, we're supposed to remove personal identification. Go back and read the LOCA rule again. You can file them under seal. Counsel, I'm going to go back to this – these findings, or whatever they are, because I'm really troubled here. I think the government is guilty of some level of misconduct. All right? What troubles me is what is the standard of review? If I were sitting in the shoes of that trial judge, I might have dismissed without prejudice. But here he dismisses with prejudice. And we're talking now about the standard that applies to the supervisory powers of the court, which are very, very broad in terms of our own case. Yes, Your Honor. And the standard of review under supervisory power is abuse of discretion. It's a due process violation. It's de novo review. But in all events, the court on appeal will review factual determinations for clear error. Here there are no factual determinations. And the – Well, what – well, we've covered this a little bit before, but he used the magic words that come right out of the statute. But, Your Honor, the government's position is there has to be something to back those magic words. There has to be facts. There has to be evidence. There has to be a showing. What occurred here in this – and the government is not making apologies for what occurred here in the sense that we did everything right. No. We can do better. We should do better. But the bottom line is, is that if the government – or excuse me – if cases are dismissed based on prosecutor error, whether it's a mistake or it's an inadvertent error or it rises to some level of a discovery violation, under those circumstances the dismissal by the district court bumps up against not only the separation of powers issue between the executive's power on the one hand to bring an indictment and the court's power on the other to preside over the proceedings and enter orders for justice, but it also seriously, seriously undermines society's very strong interest in ensuring that the truth is found out and that defendants – that there's a final determination of whether or not the defendants are guilty of the serious criminal charges which they're charged. I understand, counsel. You're down to about two minutes. Yes, Your Honor. You indicated you wanted to reserve. I have a question. Are you the same, Mr. Johnson, that argued the dismissal motion? Your Honor, I'm enacting you as attorney. Okay. You argued the motion? So when I look at the transcript and I see a statement from Mr. Johnson, that's you?  I was at counsel's table, Your Honor. Okay. All right. Well, did the government make this argument at the dismissal motion? Did they make this statement? The end result – I'm reading from page 20 of the transcript. The end result, Your Honor, and one thing I want to convey and make sure we are all aware of, is that the defendants are all materials we should have turned over, are all materials we should have turned over. We expect our prosecutors to turn over. And Mr. Dam, I think, in large part, acknowledges all those materials are materials that should have been turned over. Your Honor, I had – The government said that – let me finish my question. The government said that to Judge Mahan and is now contending on appeal that there should be no violations? Yes, Your Honor. The government – there was a general order of discovery that's entered in every case back when we were trying, under the old rules, trying those cases, which required the government essentially for open file discovery. That rule has since been changed when we changed the local rules. And in that, because these documents fall within the ambit of that order, they should have been turned over. The government does not dispute they shouldn't have been turned over. We dispute whether it is Brady, Giglio, or a constitutional violation or a statutory violation. That is where the line is drawn with respect to the supervisory powers that the district court tried to invoke. So according to the – No, you go ahead. According to the government, what should be done? What do you want us to do at this point? Your Honor, the government asked that the dismissal order be vacated and that it be remanded for a new trial. The remedy here is a new trial. There's no case that holds a Brady-Giglio violation in and of itself, if this even rises to that level, would be – would require dismissal. Well, shouldn't we actually send it back to let the district court make a finding as to whether or not there was a Brady or a constitutional or statutory violation? Your Honor, even if it was sent back, what would there be a hearing on? That these are the documents. They were voluntarily turned over. At most, it would be a Brady-Giglio violation, but the remedy for that is a new trial. They already have that remedy. It's not – it's not dismissal. There's no case that holds a Brady-Giglio violation arises to a dismissal unless it's outrageous. Well, he didn't make the appropriate findings. He didn't make a finding of a violation of a statutory apparel right. He didn't make a finding of whether or not there was a less extreme remedy than dismissal with prejudice. He didn't make those findings. He did not make those findings, Your Honor. But even if we sent it back and he made some of those findings, the remedy is a new trial. It would not be dismissal. So if we sent this all back and we said, okay, here's the 650 pages, the prosecutor disclosed them. If he – he disclosed them during trial. So at best, you have a late disclosure. At best, a Brady-Giglio, none of which requires a dismissal. It would be simply a new trial. So if this Court reverses and remands, the remedy is already in place, and that is a new trial. There's no authority to dismiss a case under those circumstances unless it's outrageous, shocking the conscience, is – and is substantially prejudicial to the defendant. Our contention at the bottom line here, Your Honors, is that the judge used a mallet to swat a gnat. Yes, I'm not making excuses for the disclosures. What I'm saying is, is that prosecutors are not perfect. No one's perfect. Every courtroom, every trial I've been involved in, at least in my experience, there's been a mistake made somewhere along the line. It just happens. But the issue is, are we going to penalize society for the mistakes of a prosecutor? And that, Your Honor, is clearly too high of a price for society to bear, especially for something like this, which I guarantee happens in every courtroom across the United States every day, some way, shape, or form. It may not be 650 pages, but are documents sometimes inadvertently not turned over? Yes. Are mistakes made? Yes. Do people say things they probably shouldn't say on the record?  But that doesn't mean cases should be dismissed willy-nilly and just tossed out because someone is outraged. It has to be shocking and outrageous conduct by the defendant. Thank you, counsel. I have one more quick question. Sure. Go ahead. Just a quick question. Yes, Your Honor. Was this matter referred to OPR? Yes, it was, Your Honor. Okay. Thank you. Counsel, you have consumed all of your time, so the government's time has now been consumed. Thank you. We'll hear now from the defense or from the appellees. May it please the Court. My name is Jim Sanders. I represent Sean Flanagan in connection with the portion of the appeal that deals with the dismissal of the indictment. Question, counsel. Certainly. I have four names in front of me here. Are you all going to participate or not? Mr. Chapman and I are going to argue, Your Honor. All right. And, yeah. You have very fair, very well. Have you divided it by subject? He's going to argue the Hyde Act. I am not. I'm going to argue the dismissal of the indictment and the double jeopardy issue. And he's also going to argue a portion of the dismissal of the indictment and the double jeopardy issue. Okay. I apologize for that, but I'm going to start. I was trial counsel, so I know the sequence of events that happened here, and I think the Court has got them right, but I think it behooves me to go back over them briefly. We've had an incident at the very beginning of the trial with respect to the IRS agent in this case where we had asked for notes of interviews that he conducted with witnesses, and we were told there aren't any discoverable notes. And that's cited in my brief and also in my errata of record. Later, we're given hundreds of pages of notes of witnesses a couple days into the trial, and we're told now we have everything, that we've got all the notes. The trial goes on, and Lou Estlick is called as a witness. And Lou Estlick is a key witness for the government, and he's pled guilty in connection with the case, and the government brings that out, and there's no surprise there. And then they bring out this 1956 conviction. We have a sidebar. We say to the judge, we don't know anything about this conviction. And the judge orders the government to turn everything over, and we're told that we have everything. There's another incident with a woman named Cheryl Michael where she testifies that she's met with the IRS agent. The IRS agent has taken notes. We don't have those notes, and we never get them. But it's another instance where the government represents to the court that we have everything. Then Mr. Haynes testifies, and Mr. Haynes testifies about a conviction that he has in connection with the securities fraud case. We've never heard of it. You can see from the record that we immediately ask for a sidebar, and we immediately express the view to the court that this is the same type of conduct that had happened with Lewis Eslick. And the government again says, oh, I thought we gave them to them, but we'll give them it if they don't have it already. All right. So far, there are four incidents. Yes. Are there any more? When you get the records, Your Honor, you realize there are more. Because when you look at the 650 pages, and I want to deal with this, if I may, in sequence again, we have the hearing outside the presence of the jury. Mr. Dam says, I gave him this stuff, but I'll make another copy of it. We all go home for the night with the understanding that whatever we've been given before is going to be recopied and given to one of the attorneys. That attorney gets about 300 pages of documents that night, sometime between 5 and 6 at night. Another 300-plus pages are delivered to him the next morning before court. So when we walk in the next morning, we've got 650 pages of documents that have been delivered to one counsel since the session broke the day before. So what happens is when we review those documents quickly, and this is done by one of the counsel, the one who gets them, he excerpts from those records certain documents which are then discussed at this first hearing on February 7th. That's Exhibit A, which is in the government's errata of record. And you'll see that in that excerpt that he's taken out of the 650 pages, he's got rap sheets for some people, because we never got a rap sheet for anybody in this case until the day they were delivered on February 7th. There are no documents showing that we got any rap sheets. We had none. There are rap sheets in that record, and there are other things. And we discussed those in front of the judge. So when the government says they didn't have an opportunity to deal with these records during any of these hearings, that's just untrue because we dealt with them at February 7th. We talked about the fact that a woman named Sue – I'm sorry – that an individual named Bruce Barton, who had testified as a government witness, had pled guilty and entered into a 5K1 agreement with the government, and that had been undisclosed to us at the time he testified. The government did not deny it during the hearing. Would that be a fifth incident, or is that – Well, this is now – I'm trying to get a sense of – This is at least the fifth incident where we haven't been given something. All right. And of those five incidents, how many of those were associated with Mr. Dam, the assistant U.S. attorney? He was the lead counsel, as always, Mr. Dam. All right. So all – No one else – The representations that were made were all made by Mr. Dam, is what you're saying. That's correct.  Okay. Then we got Mr. Eslick's rap sheet. Now, you'll remember that Mr. Eslick had been impeached by the government with his 1956 conviction for impersonating a naval officer. Mr. Eslick, it turns out, when you look at his rap sheet, has 13 known aliases listed on his rap sheet, clearly the kind of thing that we would have asked Mr. Eslick about if we'd had the ability to know about them at the time he'd taken the stand. He has arrests for armed robbery and kidnapping. It's unclear from the rap sheet how those were resolved, but you can look at page 550 of the – 650 pages to see that. He has an incident on his rap sheet which may be impersonating a naval officer, but it's referred to separately as false government documents, and he has a 5K1 agreement with the government in connection with his guilty plea, which is also undisclosed to us. That's another incident. Guilty plea in this case? Yes. He's testified. Same investigation? Right. Doug Ansell had testified as a witness. Now, Doug Ansell has a rap sheet, and there may be an error in reading his rap sheet. We represented at the Court that morning that Mr. Ansell had a conviction for a felony. It appears that he was convictive of a felony, but it might have been a wobbler in California, and he might have been sentenced as a misdemeanor. It's hard to tell looking at it. Mr. Ansell had come and gone, but when you look at his rap sheet, which we also got that morning, he's got, among other things, entries concerning auto burglary, burglary, threats to life. We'd never gotten that rap sheet when Mr. Ansell testified. Mike Haynes, I told you about, well, we get his felony information that morning. We get his plea and cooperation agreement in this case for the first time that morning. All stuff that we would have been able to cross-examine him on, but now we're in a position where we have all of these documents to look at, and nobody from the government says once, hey, it's not Giglio, it's not Brady. We need to have a more detailed hearing about this, Your Honor. Instead, they just say, hey, we thought we turned him over. Let me deal with that for a second. If you look at the rap sheets which you now have in the unredacted form, you'll notice they were all run the first or second day of the trial. How could there be any confusion about whether they were turned over to us? They ran them as the trial started. They didn't give them to us. They thought they were significant. They thought they were important. They withheld them. There's other stuff in there, too, with witnesses who are still to come. We talked about some of this at the very first hearing in front of the judge. This is the February 7th hearing. Again, the government raises no complaint that we're saying anything that's wrong. James Farrell. James Farrell had been a co-defendant in this case. We did get his plea agreement prior to the start of trial. What we didn't get, which was disclosed to us the morning of February 7th, were an SEC administrative proceeding that had been brought against him, an opinion of an SEC law judge, Brenda Murray, with findings of fact concerning a securities fraud that Mr. Farrell had entered into, undisclosed to us until the judge finally ordered them to be turned over. There's others. There's Bridget Richards, who is an upcoming witness. She has an arrest, at least, for drug possession. Other people had drug arrests that are shown in the rap sheets. John Potter, who's a government witness who's upcoming. We get his cooperation and plea agreement. His rap sheet showing a 1985 ITSP securities fraud guilty plea. We also get, and this is interesting when we talk about the judge's basis for finding that this was flagrant misconduct. We also get in his, one of the 302s, this is Exhibit A-288 in the 650 pages. The first part of the documents have an A prefix in front of them, and then whoever was numbering them stopped doing that and just started using the numbers. This is page 288, but has an A in front of them. It lists that he had seven written proffer agreements with the government. None of them are in the 650 pages, despite a specific request in writing of the government for every proffer agreement that Mr. Potter had entered into. That request letter is in the excerpt of record. I sent it before trial. I listed Mr. Potter. We got none. Roberts. I think you said request by the government. You meant request by the defense. Pincus. I'm sorry. That's fine. Roberts. Well, counsel, you've certainly enhanced our perception of what actually went on. What about the response to the argument made by the U.S. attorney that you have to show a constitutional violation as well? Well, if you'll notice in their briefs, they keep talking about this being a due process dismissal of the indictment. Of course, in their brief below and in our motion below, it was briefed as a supervisory powers request for dismissal of the indictment, not a due process dismissal. And the law is different with respect to both. Counsel gets up and says, well, it's got to be a violation of Federal law and it's got to be gross misconduct. It has to be flagrant and willful misconduct that a court thinks it's important for the supervisory authority of the court to put a stop to. And if there's anything more important for the supervisory authority of a court than stopping what went on here during a two-and-a-half-week trial, I don't know what it is. I apologize for raising my voice. Now, counsel contends that the word flagrant, among others, is unsubstantiated by any findings of fact. And I suppose that sort of does raise the question of what is our standard of review on the basis of this showing within the context of the supervisory powers? It's an abuse of discretion standard, Your Honor, and that's what the circuit has held and that's what we submit as appropriate here. And let me just go back again because I want to repeat. There were two hearings here on this issue, February 7th and February 20th. And at neither hearing did the government contest any of the things were not Brady or Gigliam material. They made a conscious, tactical trial decision. And now they're saying, well, there should have been more specific findings. They could not contest it is what I would submit to the court. Ginsburg. Excuse me, counsel. You keep saying this was a supervisory power decision, but when you look at page 327 of the transcript, the court says that he makes a finding or a conclusion of law that this is a due process decision. He says, so it's more than 600 pages, so it's not some slight oversight, but it strikes at the very heart of the government's obligation. It subverts the due process rights that the defendants are guaranteed by the Constitution. And then he says on the next page, he again reiterates that it's a violation of their due process rights. And then he concludes that there's no sanction short of dismissal that could remedy. Of course, he doesn't say short of dismissal with prejudice, but he says short of dismissal. So it's kind of ambiguous what he's really doing here to me. Well, I can only represent to the court that what we say in our memo below in our motion was to dismiss it pursuant to supervisory powers. We cited the court specifically to the Luang case. I'm going to mispronounce that, which is the district court case from the Central District of California, which is, as I recall it, a supervisory powers case. And that's the case that he reads as he makes his decision at the end. He did mention that case. Now, what about these comments by the trial judge that this was not intentional, but it wasn't unintentional? What are we supposed to do with that? I think you have to go with what he finally said at the end, Your Honor, which is it's flagrant and it's willful, and it was a violation by the government of its obligations. And that's the finding that justifies the dismissal of the indictment. And that's the wording of this Court's decisions on a dismissal of indictment in a situation like this. Maybe it's the difference, to borrow a baseball phrase, between an intentional walk and an unintentional intentional walk. Very well may be. I've promised Mr. Chapman that I've saved him some time. I know he's going to address the double jeopardy issue. If the Court has no further questions for me. Good afternoon, Your Honor. Stan Chapman, appearing on behalf of myself. I wanted to address one point that you just brought up, which was the unintentional intentional. I believe what the judge meant there was that he wasn't going to find that they did it on purpose, but it really didn't matter whether they found that he did it on purpose, whether it was intentional or not. It's the fact that it happened. And the judge was very clear when he said that when you get right down to it, how could anybody, how could any defendant ever prove that it was intentional unless the prosecutor himself said, yes, it was intentional. There's no way to prove that. What he looked at was, what the judge looked at was really what is the effect of this. And when he said it's not why it happened, it's that it happened at all. And in fact, it's that it happened to us in this case. And that was the crucial thing. We talked a number of times about the contents of the documents and whether they were relevant to us or whether they were material or whether we could have used  Not the issue. That's our call. Our call is to determine whether that information is useful to us, whether we need to investigate Sue Parson's drug conviction 17 years ago or whatever it was, whether we need to investigate anything about Doug Ansell or look at the proffer agreements, whether any of that stuff is material to us. That's for us to decide. The government's obligation is to turn it over. Our obligation is to determine whether or not it's material and useful to us as impeachment evidence. And that's something we need to be provided with for that reason. And I think that's where he was going with the question. Do we have to make a determination on materiality? I don't think we do. The real question is. As a reviewing court is what I'm asking. I don't believe you do, because, first of all, that was never brought up below, materiality of the documents. It was, as you pointed out, Your Honor, is that they should have been turned over. That's what Greg Dam said on February 6th and February 7th. That's what Eric Johnson said 20 days later. It should have been turned over. It wasn't until later on that we found out, no, it shouldn't have been turned over, or we didn't need to turn it over. That's a different story. That came up here. That wasn't raised below. It was clear that those documents should have been turned over. Whether they were all Giglio, whether they were all Brady, doesn't matter. The rap sheet's in there. That's Giglio. That's information that we may or may not have found useful to us in our defense. But that's our call. That's not their call. That's our call. Their call is to turn it over. And that's a constitutional obligation on their part. And when Judge Mahan spoke about a due process violation, yes, that may, you know, the government is trying to say that that made it unclear what standard he was using. That wasn't unclear. He said anything less wouldn't be a sanction, a proper sanction to the government. A sanction to the government is supervisory powers, which can include due process violations. But if we are on the due process violation track, we probably should be looking at harmless error, in which case the dignity of these documents probably does become relevant, no? Well, if we were looking at it from a – if you're looking at it from a due process violation, then perhaps that is the case. But, again, that is something that was not brought up below. The briefs are very clear that, in fact, in their brief to the district court between February 7th and February 27th, they made it clear. Defendants are proceeding only on a supervisory powers basis here. They knew what the basis was. It's not until we got here that they changed it. So the important point is that it was supervisory powers. It was done as a sanction to the government. And that's a supervisory powers issue. Now, with respect to the double jeopardy issue, they've already said, as they've said many times in their brief, that the judge abused its discretion. And if you abuse your discretion on a mistrial that's granted sua sponte, and this mistrial was granted sua sponte. We didn't ask for it. We were very clear. We don't want a mistrial. The judge even made sure to ask Mr. Sanders again so that the judge knew for sure. And Mr. Sanders said, that's correct, Your Honor, we do not want a mistrial. Aren't the cases pretty clear that a dismissal of an indictment for Brady or Giglio does not equate to double jeopardy? It's not violation of double jeopardy principles to retry? That in and of itself might be the case. But this case, this trial was not ended by the dismissal. This trial was ended on February 7th when the judge sua sponte declared a mistrial. And what that did, that took away from us the opportunity to do a number of things. It took away, in general, our right to continue with this trial if we so decided. If the judge had said, yeah, you know what, this doesn't rise to the level of a I'll grant the mistrial, we might have had a different opinion at that point. We would have had a different opinion. In reading what he said, actually, it seems to me that this comes under the, at least in his view, the manifest necessity prong. Because he said over and over, this just can't go on. We've had 26 witnesses. We can't call them all back. We can't take a continuance and have this jury just sit there or send them away for He basically said, this can't go on. Which strikes me as making a manifest necessity determination. We've both, both sides have agreed in their briefs that there was no manifest necessity here. If the judge found manifest necessity, he has to be clear about it. Well, he certainly wasn't clear about almost anything else. I wouldn't go there. I don't think that gets you anywhere. According to bonus, it's the government's obligation to make clear the reasons for the mistrial. They have that obligation if they want to reserve their ability to retry the case. And if there wasn't any clarity about it, if they didn't understand the reasons for the mistrial, then it was up to them, this Court's bonus opinion, to say that or to find out what it was and to make the record clear on that point. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision, and the Court will adjourn. All right. Siri, I hear you. All parties present, I'm going to hand this to the judge for the magistrate's order of appeals for the right circuit without the card. The court for this action shall now stand adjourned. Thank you.
judges: O'scannlain,hawkins,wardlaw